Please be seated. Good afternoon ladies and gentlemen. We're here for Marshall v. Marshall. Counsel may proceed. Are you dividing up your argument? Yes, your honor. Eric Brunstad on behalf of Pierce Marshall. If I may have 20 minutes for opening and 10 minutes for rebuttal, your honor. We don't have to hear from multiple lawyers on the same side? I'm sorry, your honor. I misunderstood. No. Just one lawyer for each side, I believe. Fine. Thanks. You may proceed. Thank you. The Supreme Court teaches that there are some principles of federalism that are more important than federal jurisdiction, including bankruptcy jurisdiction. And this case illustrates why. In this case what we've had is a district court concluding that a decedent's principal estate planning instrument is a forgery and was corrupted by undue influence, completely contrary. Counselor, you just started talking about jurisdiction. Did the bankruptcy court have jurisdiction? The bankruptcy court, Your Honor, at best, Your Honor. Now, I say at best. Wait a minute. Now, the case then was sufficiently there within the federal jurisdiction that an appeal can be taken to this court. Regardless of what it did. Your Honor, I think one of the problems that we have and why I can't answer that question yes or no exactly except to say that Ms. Marshall has not demonstrated that there will, in fact, be any tangible effect on her bankruptcy estate in this case from the outcome of this case. But the claims made were in the nature of issues that could be dealt with by a bankruptcy court. And she was in a bankruptcy status at least at some point in time That's correct, Your Honor. But our submission is that the probate exception precludes bankruptcy jurisdiction as the Supreme Court held in the Harris case that we cite in our papers. I understand. But you're saying then that the bankruptcy court is totally without any jurisdiction. Correct, Your Honor. The bankruptcy court has no subject matter jurisdiction over the issues that it undertook to adjudicate. What the bankruptcy court should have done was to recognize it did not have jurisdiction and wait until the probate court, who did have jurisdiction, completely resolved all the issues such as the validity of the living trust, the entitlement of all the various parties. And if, in fact, she was entitled to something out of the probate case, then that could have been brought to her bankruptcy case. Did you move at the minute any papers were filed in the bankruptcy court to dismiss on jurisdictional grounds? Correct, Your Honor. We moved to dismiss. Did you take any kind of an interim appeal at that point? We took several interim appeals, Your Honor. To the district court? To the district court, Your Honor, yes. The way that it worked at the beginning, we answered the complaint and we denied jurisdiction. In the answer? Correct, Your Honor. Okay. We moved to dismiss for lack of jurisdiction. We contested the bankruptcy court's jurisdiction again immediately before trial. We then, on appeal, asserted that there was a lack of jurisdiction. Okay. And the district court ultimately concluded that the bankruptcy court did not have jurisdiction to issue a final order resolving her probate issue claims. So, really, from your point of view, if we were to accept your argument as made, we'd say no jurisdiction in the bankruptcy court to dismiss this whole thing, right? We would ask Your Honor. At the end of the case, do you have nothing more to say? Correct, Your Honor. And I think that that's bolstered by the point that, in this case, the probate court expressly determined that it had exclusive jurisdiction over her claim. I'm not worried about the probate court. I'm worried about the federal court. Leaving that aside, is it correct that if we decide that you are correct that the probate exception to bankruptcy court jurisdiction precludes bankruptcy court jurisdiction, we get no further? You prevail. Correct, Your Honor. Is that right? We get no further, and that is the end of the case. That's correct, Your Honor. The bankruptcy court exception is a prudential doctrine. I believe, Your Honor, the probate exception has several origins, but I think it is probably proper to construe it. It's judicially created. It is judicially created, Your Honor. It's been around since 1827, Armstrong v. Lear. What's our standard of review of the district court's ruling on your request to dismiss? It is de novo, Your Honor. It's a subject matter jurisdiction on legal grounds. It's de novo. Even though it was prudential? Correct, Your Honor. I think, Your Honor, that it is a legal doctrine that, if it applies, it outs jurisdiction of the federal court. And it is a matter of subject matter jurisdiction, which is reviewed de novo in this court. What's it prudential, even though it's jurisdictional? Your Honor, I think the best characterization of the probate exception is to construe it the same way the Supreme Court in Ankenbrand construed the domestic relations exception, to say that it is a longstanding canon of federal doctrine that preserves federalism, essentially, and that when Congress enacts legislation, any statutory legislation, it presumably enacts it with the domestic relations exception in the background. And the Supreme Court in Ankenbrand, a relatively recent decision, reaffirmed the validity of the domestic relations exception. And the Supreme Court has repeatedly reaffirmed for over a century the existence of the probate exception and applied it specifically in bankruptcy in the Harris case. Do you think the abstention doctrines like Colorado River also bar jurisdiction? Your Honor, I think the abstention doctrines apply where the court has jurisdiction, but it decides not to exercise it. The probate exception works very differently. When the probate exception applies, it means there is no such exception. But you say that Colorado and so on, the abstention doctrines do not apply in this case. Well, Your Honor, we did ask the bankruptcy court to abstain, and that was denied. We did ask the bankruptcy court to abstain. You mentioned in your brief also, right? Those decisions, Your Honor, are not reviewable. I'm sorry. I thought what you were saying was the probate exception applies. There is no jurisdiction. Correct, Your Honor. But if you rule against us on that, there should still be abstention. Your Honor, unfortunately, we did not brief the abstention doctrines in this court because they are nonreviewable at this level by statute. That's why we did not raise abstention. The statutes are quite clear. The district court is the last stop on abstention in bankruptcy. So, accordingly, we are left with the probate exception, race judicata, collateral estoppel, Rooker-Feldman, no such cause of action, our due process grounds, and our abuse of the cruelly erroneous evidentiary points that we make. All? Yes, Your Honor. I tell you, it's throwing a no-smoking sign. It's something of the smorgasbord approach, but in this case, Your Honor, I think it's fully warranted. Now, there's a point I think that's very important why the probate court's determination of its exclusive jurisdiction is relevant to the probate exception, because under the Durfee v. Duke Supreme Court decision and the Underwriters National, the Supreme Court tells us that once a state court has determined its own jurisdiction as exclusive or otherwise, that determination is binding under federal principles of race judicata on federal courts. Now, this court in McCann concluded that where there was exclusive jurisdiction in a probate court, the probate exception applied. I'm inclined to disagree with you. If a state court has jurisdiction and orders payment of a claim that's discharged in bankruptcy, by gosh, the bankruptcy court can set it aside. It can, Your Honor, but this is a completely different context. This is a case where federal is setting aside a state court judgment, and it's not barred by any doctrine. It's by statute enacted by Congress. That's correct. That's a result of payments. That's correct, Your Honor. But here, that is a completely different context from that, and in addition— You gave me a rule that was across the board. If I put that opinion, I'd catch it from the law review writers. I think, Your Honor, that in this case, what we need to focus on is the type of claim and the issues that are at stake here. And that is why the probate exception applies. A probate exception applies to protect three different kinds of things. One, the probate court's exclusive authority to decide probate issues. Second, its exclusive jurisdiction. And third, its NREM jurisdiction over the decedent's assets or assets that could be part of the decedent's assets. Let me ask you this question. If I look at this case as being purely a civil wrong case that has nothing to do with the distribution of assets from an estate, the validity or invalidity of a will, but merely the five elements laid down by the New York— I mean, by the New Mexico Intermediate Court of Appeals, there's nothing in that about probate that the plaintiff has to prove to recover, is there? Your Honor, the Supreme Court in the Sutton case teaches us that we must pierce this form of the claim for the substance. The issues that— Which of the five elements impede the probate process? In order to prove her claim, she must demonstrate, one, two key critical elements. One, supposedly that Jay Howard intended to give her a gift of his assets. Two— That's not an issue decided in probate. Your Honor, what the probate court must decide is who has claims of any kind against the decedent, whether it's a claim of gift— This claim is not against the decedent. That's correct, Your Honor. The point of Sutton— The claim is against the individual, and it's out of his wallet that the judgment's going to be paid, if at all. That's correct, Your Honor. But in Sutton, that was exactly the argument the Supreme Court rejected, and here's why. In Sutton, the claim was not against the decedent or the decedent's estate. It was against someone who had received property from the decedent. And the U.S. Supreme Court, construing Texas probate law, said, well, but at its heart, all of the issues that have to be decided here are issues which the probate court ordinarily decides in deciding a claim of undue influence. As the federal courts have recognized in Moore, in Dragan, in Storm, in Moser, over and over again, you can't take probate issues, guise them in the form of a tort action, and claim federal court jurisdiction. The Storm case is exactly on point on this, the Seventh Circuit's recent decision. There you had someone bringing a claim for tortious interference with an expectancy in the context of an intravivos trust. Where in the Morris case from New Jersey, which the other side relies on and which the district court relied on, is there anything about probate law? I'm sorry, Your Honor. I didn't— Where in the Morris case from New Mexico, excuse me, is there anything, any mention of probate? No, Your Honor. But— It's a civil or tort action. It's a civil wrong. Your Honor— It could be fraud. It could be fraud. The question, though, is, in this case— It could be kidnapping. It could be a number of things that have nothing to do with probate that was the cause of the defeat of the money your client seeks. But, Your Honor, the very issues which the district court had to decide, which it did, the validity of the living trust, that's the same issue the probate court had to decide, whether assets were looted out of the living trust. This—the living trust is central to this case, and its validity is central because under Texas law, once the probate court decided that the living trust was the valid disposition of J. Howard's assets, it foreclosed, as a matter of law, any contrary tort actions based on an expectancy of receiving something contrary to the deceit— Against— —of the state plan. Any tort action against whom? Anybody, Your Honor, because once the probate court decided the validity of the state plan, the probate court— So if Pierce is in a car accident and you have a tort action against him, because he's inherited from the trust, you can't satisfy that judgment out of those funds that were delivered to him from the trust? No, Your Honor. That—because the negligence action, the car accident, is not a cause of action that has as elements any of the issues that the probate court has to decide, and is not one that would be foreclosed under Texas law. Let me explain. In deciding the validity of J. Howard's estate plan, the probate court had to decide who had legitimate claims of gift, bequest, a tax claim, a tort claim against the decedent. Once the probate court determined that J. Howard intended validly to leave all of his property to one person, it precluded by operation of law, under Texas law—we cite the cases in our briefs— it precluded the validity of any contrary expectancy. Vicki's tort claim depends for its existence as an essential element on a supposedly legitimate expectancy to have received this gift. When you say expectancy and you say gift, you're talking about something that occurs inter vivos. Correct, Your Honor. Expectancy is not the state of the mind of the giver or donor. So to get a valid gift, you have to have property, you have to have an intention of the donor to deliver the property to the beneficiary or donee during the lifetime. That's correct, Your Honor. That's not what happened. And it has nothing to do with the trust. Your Honor, under Texas law, her claim is a claim of unfulfilled gift. It is a claim that she could have brought and, in fact, did bring against his estate. And she abandoned it. She has no claim against the estate anymore. Correct, Your Honor. She let everything go. All the money she threw at the estate, that's all gone. She took a non-suit. That's correct, Your Honor. And the trial judge told her that when she abandoned that suit that she was going to have no interest whatsoever in the probate from there on out. So her judgment is not a probate in character. But the probate finality rules preclude not only causes of action that were brought but also any cause of action that could have been brought regarding the decedent's intentions. And the Texas Supreme Court has held, for example, that a decedent's tax liability is subject to the exclusive jurisdiction of the probate court, even though it has nothing to do with a will contest. The Texas Supreme Court held in English v. Cobb that allegations that someone took property inter vivos from the decedent before the decedent died is also subject to the exclusive jurisdiction of the probate court. Why? Because all of those are causes of action which could be brought in the probate court. Tell me if I have this logic right. If the son had, by fraud and undue influence, caused the father to abandon his idea of providing the wife with more money, then although there might be a tort claim against the son, there would also be a claim against the estate for undue influence that would invalidate the bequests and the trust insofar as they deprive the wife. Since that claim was abandoned, it precludes the tort claim that amounts to the same thing. Have I got the logic right? Yes, Your Honor. And the probate court so held. And the answer is because in probate we need to finally resolve all claims regarding the decedent's intent. We can't have a situation in which 12 people are challenging the decedent's intent in a probate court and then have a centralized situation where that's all going to be resolved. But one person can opt out and, in the guise of a tort claim, raise exactly the same issues in Federal court, only targeted against. I think you could because the money comes from a different pot. Instead of coming from the estate, it comes from the living individual. But the theories are the same. The issues are the same. I agree how the theories are. Now tell me this. It looked to me as though the right paragraphs that I should be looking at in the Texas judgment are 3.8, where it says that the will and codicil did not result from any undue influence or any other tortious act, and 3.20, where it says that the trust did not result from any lack of mental capacity or undue influence. Is that right? Yes, Your Honor. Are there more? Yes, 3.37, where the probate court expressly held that J. Howard did not intend and did not give to Vicki a gift or bequest either prior to or upon his death, a specific finding by the probate court that there was no intent to give an inter vivos gift. He did make gifts inter vivos. He did, but he did not intend to make one to Vicki, and that's what the probate court found. You mean all the jewelry and the houses and the car and everything, the $6 million worth of stuff that she received, he didn't intend to give her? Other than those, Your Honor. Those were already given before he died. She already received them. He knew how to make a gift, and he knew how to implement a gift. That's correct, and he did not do so here, Your Honor. He did not do so, and the probate court expressly so found. Now, the probate court also found in section paragraph 3.1 that Vicki was required, was expressly required to bring any claim of unfulfilled gift in the probate court. Which paragraph was that? Paragraph 3.1, and expressly concluded its jurisdiction, saying it had exclusive jurisdiction over any such claim. Now, the reason why, again, those are critical is because under Durfee v. Duke and under Riders National, once a probate court concludes it has jurisdiction, that is race judicata. Because the probate court's determination of its own jurisdiction is race judicata, it cannot be challenged collaterally. The district court was not at liberty to decide otherwise. There are no exceptions. Was the probate court's judgment there final? It was final, and the issue was fully litigated. There was briefing. There was oral argument on the exclusive jurisdiction point. Once the probate court determined that, the probate exception attached, because the probate exception clearly applies when the probate court has exclusive jurisdiction. Was there an appeal taken from that ruling? There is an appeal taken, and that is exactly the same situation in the under Riders National case. The Supreme Court said there's still an opportunity to appeal that, but the challenge to exclusive jurisdiction lies in the State appellate courts, not in the Federal courts. In the meantime, under the Texas Supreme Court decision in Scurlock, the probate court's judgment is final. Because it's final under under Riders National, it is binding fully on Federal courts. Because the probate court had exclusive jurisdiction, the probate exception applies, and this case must be dismissed. I'm curious. Is there any analogy in the probate exception to admiralty law, where what's critical is the location of the race? No, Your Honor. It's broader than that, because in order to maintain the integrity of the probate system, the certainty and the finality of the outcome, and the in rem effects of quieting title, all claims against the decedent, whether they're based on gift, unfulfilled, unfulfilled bequest, whether they're tort claims involving the decedent, whether they're tax claims, once the probate proceeding commences, the probate court has exclusive jurisdiction to resolve them and does so finally, even under Texas law, questions of divorce. Because the Texas proceeding is comprehensive, we have this special Texas rule that once the probate court validates the instrument, here the living trust, all tort clauses of action which are based on contrary expectations are barred as a matter of law. That precludes Vicki's claim here, because her claim depends for its existence on a legitimate expectancy, which under Texas law is now foreclosed. Did you want to save any time? Yes, Your Honor. I wish to save 10 minutes for rebuttal. Would you clarify one word for me? Both you and the other side repeatedly in your briefing used the word expectancy. Would you give me your definition of that word as used in the briefs? My view of it is just simply a claim of unfulfilled gift that the decedent allegedly Not a contractual promise. Is that right? Your Honor, the Texas jury and the district court both concluded there was no promise in this case. The use of the term is what I'm trying to get at. When you guys use this in the briefing, you're always talking about an expectancy, and I'm trying to get an agreed handle on it if I can. Your Honor, my definition of it would be simply a claim of unfulfilled gift, a gift that when the decedent died is alleged to have existed and on which the claimant claims she is entitled to something. What kind of a claim is it? Is it a tort claim, a contract claim, an assumption claim? What? It is under Texas law a claim of unfulfilled gift, which I believe Texas law does not even recognize. I thought there was no tort claim under Texas law. Our argument, Your Honor, is that no Texas court has ever recognized this cause of action, tortious interference with expectancy of a gift, and that before, again, any federal court should even entertain such a cause of action, it should be a question that's properly certified to the Texas Supreme Court. We've briefed that issue. If there are no further questions at this point, I would like to reserve mine. Thank you, counsel. And may it please the Court, I confess to feeling some sense of surreality arguing this case and hearing counsel's argument to the effect that the Texas probate judgment in effect decided the issue that was presented before the bankruptcy court and before the district court in view of the fact that the bankruptcy court was told repeatedly that that was not what was being tried in the probate court. What do I care what they were told when I read the Texas judgment? I mean, I'm looking at these paragraphs here. It looks like Texas just decided that the trust did not result from any undue influence. It was not his intention to give her a gift beyond what he'd already given her. What the Texas court decided was what do I care what arguments the lawyers made? Well, what we care about, that is, that there is a doctrine of judicial estoppel, and it is a question of what lawyers and what a party can rely on. If a party tells a court one thing, that's a pretty long reach. Judicial estoppel applies when a party plays fast and loose with the courts by representing in one court such and such, getting an advantage from it, receiving and obtaining the advantage, and then making a claim inconsistent with the advantage it's already obtained in the other court. That's correct. So far, the son here has not obtained the advantage. Well, the advantage is, of course, the very judgment that Your Honor is talking about, which would not have been obtained because there would have been an injunction in contempt if, in fact, those representations had not been made. And, of course, those representations were made repeatedly to the bankruptcy court, and the bankruptcy court repeatedly was told we are withdrawing any question with respect to the debtor. We are not going to proceed with anything with respect to the debtor in the probate court. And, nevertheless, we have this judgment that results. Now, all of that aside. And that the wife had no idea that the son was going ahead in Texas with attempting to establish that there was no undue influence and she had no expectancy of a gift? Oh, she knew. But what she knew was that the action that was proceeding in Texas was an in rem action against the estate, determining what was owed by the estate and to whom the estate should be. This isn't responsive to my question. Are you saying that she didn't know that an adjudication would be sought, that Howard Marshall, too, did not intend to give to Vicki Lynn Marshall a gift, a request from the estate or from the living trust? I am saying that that issue with respect to the question as to whether an inter vivos gift, the inter vivos gift that we are talking about in this case was intended to be brought, A, she did not believe that that was being sought or should be sought, B, that the Texas court did not have jurisdiction to decide that issue. Once she withdrew and voluntarily non-suited that issue. So did her lawyers move for an amendment of this judgment to get rid of paragraph 3.37 and the other paragraphs that bore on this? The understanding of all was that this was an evaluation. They were tricked. They could have gotten an amendment. The only trick is the one that is trying to be tricked on this court. If every single paragraph in this Texas judgment talks about claims against the estate, there is even the paragraph about a gift. It is all an in rem action versus the estate. You know, the central fallacy that is being pursued here is. Wait a minute, counsel. Let me back up. Was a copy of the Texas judgment, the second modified final judgment, served on the wife before it was signed and after it was signed? Was it served? Yes. I presume that it was. I don't know as a matter of fact. Do you have any reason to doubt it? I don't. Ordinarily they are. I don't. And I don't understand what you're saying about what it doesn't address because it says, quote, it is further ordered or judged and decreed by the court that J. Howard Marshall II did not intend to give and did not give to Vicki Lynn Marshall, a.k.a. Anna Nicole Smith, a gift or request from the estate of J. Howard Marshall. From the estate of J. Howard Marshall. Or from J. Howard Marshall II living trust. Or from the living trust. Who were upon his death. That's correct. That's what you've got to get around. That is the question that is presented to a probate court. It is not the question that was presented to the. In order to decide that, they didn't decide only that she can't get anything from the estate or the trust, but also that he had no intent to give it to her. That he had no intent to give her anything from the estate or living trust. By its nature, that means the estate and living trust do not, of their nature, become significant to the probate court until his death. Was he explaining in the bankruptcy court that he did intend to give her money from the living trust? No, no, no, no, no. That is not correct. The bankruptcy court. That's where the money was. Not necessarily. This man was alive. He was, in fact, we know that there was money going in and out of the living trust. Stock going in and out of the living trust constantly. He was paying for his cigars out of the living trust. No, no, no, no, no. Huge amounts. Most of the money was in the living trust. Huge chunks of money was going out of. Huge chunks of stock was being sold. Cigars. Pardon me? He probably bought very good cigars. Well, he must have, because there were thousands and thousands of shares of stock in Coke that were transferred out of the living trust and sold for tens of millions of dollars at various points in time. The fallacy here is that somehow when he was alive and had, yes, a living trust, and yes, had written a will, that somehow everything was static at that point and that anything that he wanted to give to someone else had to come from those things. That wasn't static. In fact, the reason that he wanted to give a gift of the nature that he wanted to give to his wife was that he felt that he was bringing more value to his assets. When you use the term gift, you're including the element of delivery. Did he ever deliver anything to her that he intended to deliver to her? He intended to, and he never did. Did he? In this respect, he didn't. Well, what we do not know is, we do not know if there was ever a finalization of the catch-all trust, because it was missing. Why was it missing? Because it was never produced. Why wasn't it ever produced? Because Pierce didn't produce it, as was found by the bankruptcy court. It was suppressed or destroyed. Now, certainly she can't be blamed for the fact that the central document in the case doesn't exist. Your judgment's against Pierce individually. That's correct. Did you prove that he tore it up or he sequestered it? The bankruptcy court found, as a matter of fact, that he did. In fact, it was in the control of his lawyer, and other documents were produced. Was that part of the discovery sanctions? That was part of the discovery sanctions, yes. It wasn't proof. I can't go to read the testimony. It's something the bankruptcy judge made up, right? Well, he certainly didn't make it up. I mean, that's what he put in his order, right? And there's something in the record to support that? Absolutely. I thought all there was in the record to support that is that he was dissatisfied with the son's compliance with discovery, and he therefore entered findings of fact against the son on every contested point without evidence. Judge Bufford repeatedly, over a lengthy period of time, required the documents be produced. They were repeatedly ---- You're not responding to my question. Was there evidence or was there merely a failure to comply with discovery orders? The evidence was the failure to comply with discovery orders, notwithstanding numerous opportunities to comply. Did anyone testify he destroyed the documents or I destroyed them at his direction? The document was not produced. Perhaps it was suppressed. Perhaps. Who knows? It's so tricky asking you questions. I'm sorry, Your Honor. I don't know. If your question is, was there evidence? I'm trying to find out, was there testimony that established that the documents were destroyed or was the finding of fact that the documents were destroyed entered as a discovery sanction? I thought it was entered as a discovery sanction, and I wanted to make sure that that was right. Yes, that is correct. I apologize that I didn't catch the distinction you were making. It was entered as a discovery sanction because the bankruptcy court found, as a matter of fact, that it either was suppressed or destroyed. It was not produced either in the district court as well, despite the fact that there was about 400 boxes of documents that were produced. Somehow this one was missing as well. As I recall from the record, the district court ultimately set aside the discovery sanctions. The district court reversed the discovery sanctions because of the failure of the sanctions. So there was no such fact even established by the bankruptcy court's alleged sanctions. It was remanded to the bankruptcy court, and the bankruptcy court then did reaffirm the basis for the sanctions. The problem is that this was, of course, the central document in the case. This was the document which was to form the basis of the gift, and its absence put a huge gap in things. But you know what? Even setting that aside, what we know is that the district court did a de novo review of this case and concluded that, in fact, this document would have been the embodiment of the gift that was intended to be given. On that basis, it seems to me that there is just, you know, it is in some ways immaterial what the bankruptcy court found or the basis for the bankruptcy court. When was the gift to be delivered? Well, we do not know. What we know is that it was the ñ How do we know we have a gift? And if we don't have the three elements supporting a gift, we don't have a gift. So why do you keep talking about a gift? What we know is ñ A gift has not been made in this case. There was not a gift. What we know is that there was ñ You don't have a gift. What we have is evidence that there was an interference with the gift being delivered. If you don't have a gift, you don't have an inheritance, what have you got? No, what you've got is you've got someone trying to stop you from getting a gift. And that's what happened here. And, in fact, succeeding in stopping that. In fact, it would be ñ Do you think Pierce and the wife were in some kind of fiduciary relationship to each other? No, they clearly were not. No, they were at arm's length transactions, right? That's correct. And each had equal access to the deceit, right? No, that is not correct. And each could have influenced whether to make a gift or not to make a gift, couldn't they? In fact ñ And we don't know what happened. In fact, what we know is that both the bankruptcy court and the district court found that there was an intent to give the gift. And we have a probate court that said there was not an intention to make a gift, now or at death. What the probate court found was that there was no intent to give a gift from the estate or from the living trust. That was not necessarily ñ and that is a qualifier that is absolutely essential to determining what the probate court found. And besides, that finding was made ñ there was no evidence that was pointed to. Every item of property of any kind, description, or interest was either part of the trust, corpus, or it was part of the decedent's estate and probate. So how much broader did the probate court's finding have to be than to just say under the trust or in his estate? Well, it is not ñ it is so important what the breadth of the probate court's determination, although I would contend that it does not ñ it is not broad enough to encompass what we are discussing now. What is important is the evidence and the property delivered, as in the case of the $6 million and the houses and the cars and the jewelry and all that stuff. I have no problem with that. That's not coming back into the estate. Nobody's claiming it is. She has that, and it was hers. And the gifts were completed. But I can't find where this gift that we're talking about in this case was ever completed, and the man's dead. So I conclude there's been no gift. Well, the reason why there has been no gift as found by the district court is that Pierce and Hunter interfered with the gift being prepared and being delivered. That was the factual finding that was made here. I keep having trouble pulling this out and distinguishing it from what the probate court necessarily found. The theory of the tort is basically you poisoned your father's mind so that he didn't give me, his wife, more money. Otherwise, he would have given me more money while he was alive. And the probate court found as a finding of fact preliminary to its judgment that that didn't happen as far as I can tell. What the probate court found was, and it was necessary to their judgment, what the probate court found was, what the jury in the probate court found was that the living trust was valid and that the will were valid, and that neither of those instruments were the result of improper influence. The jury was also questioned about a number of other items which, in fact, the district court here found were altered, were backdated, were changed in various ways based on overwhelming evidence, and absolutely none of those documents were proffered to the jury, nor did the jury make any finding with respect to those documents. Well, let's get back to the property. You're talking documents now, and I'm talking property. Yes. And the only hole I could see that I thought your argument was fastening on is, okay, the trust isn't the result of undue influence, the will isn't a result of undue influence, but he took money out of the trust all the time, and he could have intended to give the gift out of his pocket, money he withdrew from the trust. But for the fact you poisoned his mind against me. But when I read the way this text is finding is worded, it's not just directed to the property that remains in the trust. It's also property from the trust, if I'm reading it right. Now, if I'm not, educate me. No, that's correct. It's property from the trust. But Jay Howard was alive. He was an elderly man, but he was a very, very alive man. He intended to, and he did, in fact, work. He did generate additional assets. Everything was not frozen in 1982 in one lump sum. There was money that was borrowed against. Those of us who have done estate planning with elderly people, you typically put everything but the pocket money in the living trust to make the estate planning simpler, and then the living elderly person just takes it out as they want it. Yes. That's why I directed your attention to what I thought was the word from, because it seems like the money would come from the trust. My husband intended to withdraw $500 million from the trust and give it to me, and he would have if you hadn't poisoned his mind. I thought that was the theory. That is not necessarily the theory. In fact, all we know is that there was an intention to make this gift. We do not know where it necessarily would have come from. That's the flaw in their argument. Jay Howard was alive. There wasn't a final estate or a trust. Where else do you find that billion dollars? The way I generate money is by going to work. He was on the boards of various corporations. He also worked as a member of the board of Koch. He, in fact, enhanced the value of Koch by working on this pipeline deal, which was in fact what motivated him to want to help her share in what he brought to the community while he was alive and while she was alive. That was the motivation behind this. The problem with their theory is that when you are alive, you do not have a final estate or a final living trust. In fact, suppose, for example, that he was not dead but that all his assets had in fact been sold to Pierce, as indeed they were. Before he died, certainly, Vicki could have brought an action against Pierce for interference with the gift. In fact, that would have been her only source of being able to collect on that. The fact that he was still alive didn't mean that he could still give the gift. In fact, in the last year of his life, he had no assets other than notes that had been given to the living trust that were payable ten years from then, long after he was no longer going to be alive, that were, in essence, valueless except to whoever gave them. No stock whatsoever. The stock had been transferred to Pierce. Prior to death. Prior to death. And for that, he took promissory notes? Promissory notes. And that was not in the trust either? Those notes were in the trust, but they were payable. You said there was nothing in the trust. Those notes were in the trust, but they were, as I'm sorry if I misspoke, they were payable for ten years from then at a time when Pierce knew that he had terminal cancer and that he had three months to live. That is why the district court was so offended by what happened here that it found that there was even more misconduct than the bankruptcy court found, that even more punitive damages should be imposed than the bankruptcy court imposed. This is a case in which very, very bright people have, from the beginning, attempted to put together a scheme that will, on later examination, appear to have some basis in reasonableness. For that reason, it is terribly, terribly important that every single transaction that went on here, every argument made in this case and below, be fly-spec'd, beyond what normally would be done. The fact of the matter is there was, and this is in fact the basis for the argument that's being made, there was a man who intended and stated numerous times that he wanted his wife to be supported, that he wanted her to be supported beyond his death. Well, she certainly had support in terms of about $6 million worth during the marriage. They were gifts that were given to her during the marriage. Plus cost of living. He took care of housing and other matters, cars, transportation. General expenses. That's correct. Plus the $6 million in gifts. Until, of course, the... He knew how to make a gift if he wanted to give one in his lifetime. He knew that, but what he did not know is what was being done in terms of the assets that he had that were being transferred to him during the last months of his life. Why should we suppose that? I mean, here's what we know. We know that he tendered a prenuptial agreement to her, and as I recall, she refused to sign it. We know about the trust and the will that exist. We know the Texas court's findings of fact about the intentions of the parties. But it seems to me that as for knowing that he intended to give the wife a whole lot more, we don't know that, and it's not consistent with these things that we do know. A, he rejected the prenuptial agreement. He rejected it. It was too long. He drew it and submitted it to her. I thought he drew it and she refused to sign it. No, no. It was drafted. It was 140-some pages long. He rejected it. B, a trust was drafted. The billing records show that a trust was drafted. That's the trust that we can't find and that we don't see. It certainly would be shocking. For a fact that he ever signed it? No, we do not know that. I thought. That is correct. So for all we know, his lawyers, some lawyer, drew it as a possibility. As I recall, all there was was a document talking about drawing it rather than anybody saying it had been drawn. No, there were billing records that showed that the trust was drafted. It was all done? Yes. Of course, those billing records were not presented to the probate court. Those billing records weren't available to the bankruptcy court. But there's no evidence that he ever signed it. That's correct. There was no such evidence. There was no evidence that he was too adult to know whether he was signing it or not. Well, there was plenty of evidence that, in fact, his eyesight was such that he couldn't see fine print. I imagine if you're that rich, you can get somebody to read it out loud to you. Well, Pierce read everything to him. That was the problem. If, in fact, an individual does not determine that a gift was interfered with until after the death of someone and after the probate of their estate, are they foreclosed forever from suing the person who has interfered with that gift? It doesn't seem possible. Are you saying that that's this case, that she didn't know until after the death of someone? After the Texas probate was all over? No. No. I'm saying that it cannot be that the probating of a will and the determination of the intent of the testator with respect to their estate upon their death, that that forecloses anyone from ever claiming that, in fact, there was interference with the gift. It does not logically follow. And that is the reason why neither the probate exception applies and the reason why, in fact, res judicata does not apply here. Incidentally, yes, in common law in most states, as I understand it, there's no such tort. There's interference with advantageous contractual relations, but gifts just don't get the same level of protection because of the freedom of the donor to change his mind and the difficulties of proof. I understand California is more liberal on this tort. Is there any reason to think that Texas would be like California? Yes, Your Honor. There's the King v. Acker case in which the court recognized the interference with inheritance. That's not a gift. That was different. No, that's correct. That's not the same. However, the restatement does recognize The restatement is not the law of any state. Absolutely. That is correct. That is correct. However, 21 states do recognize the tort of interference with a gift. That is correct. In California, is there precisely the same statute and or a decision of the state supreme court talking about expectancy of a gift? I don't know the answer to that in California. Why do we have to go to an intermediate court of appeals in New Mexico to support the district court's decision? We don't. We can go to King v. So we don't have to. We can ignore that. And we're free as a panel to look at Texas law and to decide what we think the Texas Supreme Court would hold in a matter like this. Right? I think that where the Texas courts have recognized as the Texas Supreme Court. Yes. I'm not bound by the intermediate courts in Texas. Absolutely not. But I think that we can't. But this court is required, I believe, to attempt to determine what the Texas Supreme Court would do if it can. Okay. And an intermediate If we find that the Texas court would not, that's pretty much the end of your case, isn't it? Well, I think that under those circumstances, if in fact the court were to determine that the Texas Supreme Court would not recognize this cause of action, I believe it is. That's correct. Because there's no state inheritance type issue, probate type issue. Absolutely. That was all foreclosed with the non-suit, right? Absolutely. You and I agree. Good. However, I do think it's important to note that the King v. Acker case, which is a case of an intermediate Texas court, did recognize not just the tort of interference with expectancy and it is not, but also It is like to make the predicate factual analysis and draw the factual distinctions between this case, if there are any, and that case, if there are any. No, I I mean, I can read the case, too. Okay. Sure. And the only way you can even get close to it, it runs you afoul of what the Texas probate court found as a matter of fact. It seems to me that in order to avoid the preclusion, what you have to say is, this has nothing to do with probate. This is just like when mom says that she's going to give her daughter-in-law her diamond brooch and her daughter talks her into not giving her daughter-in-law the diamond brooch. Everybody's still alive. The daughter-in-law can sue the daughter. That would be an analogy if, in fact, there was not all the other massive evidence here that indicated that there was an intent to give this. And if it were not the fact that That is the case that you have to make, right? No. That that is tortious in Texas for the daughter to tell mom not to give the daughter-in-law the diamond brooch. If, in fact, what happened after that was that the daughter-in-law took all the assets of mom so that mom couldn't give the gift even if she wanted to, that she took the brooch, mom didn't have the brooch anymore, that's this case. That's what happened here. But one important point that I wish to make, and that is the question was asked, if you decide that there is no such tort in Texas, is that the end of the case? I should point out that there were causes of action here that were alleged that were before the bankruptcy court, that the bankruptcy court, in fact, did not decide by virtue of the fact that it believed that it was giving full recompense by virtue of its determination of this one court. And none of these are here on appeal, I don't think. That's correct. What were those other causes of action? I'm sorry. What were they? There was a constructive trust, breach of fiduciary duty. I'm sorry. I believe there were three or four causes of action along those lines. Let me just say that this is an unusual case. It's an unusual case not just because of its notoriety. It's unusual more because of the nature of the findings that were made here. It is unusual because this court seldom has two courts that have ruled on the case before this court gets them. It is unusual because it is unusual to find a case in which there has been found to be such massive discovery abuse that, in fact, one court has determined some of the key issues by virtue of the discovery abuse against the abuser, and another court says, although I can determine what happened here, even if I didn't determine what happened here, I would look on the discovery abuse here and might very well conclude that that alone was a basis for doing what was done. You know what surprises me, a fact we haven't talked about? This woman, if she was right, was worth $500 million. Had she declared bankruptcy? How does that work? That's the only way we get here is through the bankruptcy vehicle. She had a small judgment against her, relatively speaking, and that would carry a bankruptcy. Was this amount disclosed as an asset to the bankruptcy court at this value? She certainly, the claim was raised in the bankruptcy court. No, no, I mean that she had an asset against the abuser. She had a cause of action, but she had a claim. Yeah, it was worth half a billion dollars. It absolutely was disclosed to the bankruptcy court. I don't know at what point it was disclosed. How come the maid isn't standing where you're standing? I think the maid got the sexual harassment judgment against the wife, and that's why the wife went bankrupt. There was a settlement of a sexual harassment or a default judgment. And, pardon me? How come the maid didn't take this asset? Did the maid get all our money? That I don't know the answer to. I do apologize for that. Why didn't the court appoint a trustee to pursue this cause of action? Well, in fact, because it wasn't necessary, because what happened was the claim was tried in the bankruptcy court. Pierce made a proof of claim with respect to his claim against her. It was after the discharge, though, wasn't it? Yes, it was after the discharge. And all the incidents of it were after the discharge, the incidents leading up to it. I'm sorry, I don't understand that. We're talking about the attorney's fee, right? Oh, the attorney's fee? Yeah, all the incidents incident to the attorney's fee took place after the discharge in bankruptcy. No, the source of the attorney's fee was pre-discharge. Oh, really? Yes. And what hours were spent pre-discharge that were in the billing? No hours were spent pre-discharge in billing. Okay, so are you familiar? Do you think you've cited all the cases that are available in the Ninth Circuit with respect to this question? I certainly hope we have, Your Honor, but I have a feeling that you're going to tell me that we haven't. Yeah, I think there's another one out there. There's some split in the circuit between the bankruptcy appellate panel and the circuits. I don't think there's any split with respect to the circuit. There's the Abercrombie case and the Kajewicz case, and both of those cases conclude that the source of the attorney's fees is in the original transaction, which gave rise to the later claim that then gave rise to the attorney's fees. How about Siegel v. Federal Home Loan? The Siegel case, I believe, was a case in which the debtor had pursued the action. And I believe that that is a distinction because the debtor, even though it could be classified, that the action could have been classified as an asset of the bankruptcy estate, the debtor on his own went and pursued it and, in effect, violated the whole concept of bankruptcy by doing that. Isn't that right? Why didn't you cite Siegel in your brief? It was available to you. I don't know. It probably was not a case that we felt was in any way significant with respect to the issues being presented here. If you read the bankruptcy appellate panel, you know that they wrestled with it. Well, in point of fact, Your Honor, it seems to me that Siegel is very, very easily distinguishable, and if the other side felt differently, I would presume that they would have cited it. I was looking for it, but I found it. Thank you, counsel. Oh, I am shown that, in fact, we did cite the Siegel case on pages 24 and 32 of our appellate brief. Thank you, Your Honor. Thank you, counsel. Briefly, Your Honor, J. Howard kept all of his assets in the Living Trust. There was no other source for the funding of any alleged gift to Vicki. It had to come from somewhere. If it didn't come from there, there was no other place for it to come from. By validating the Living Trust, again, the probate court decided who had a legitimate expectancy to J. Howard's assets and who did not, thereby precluding her tort claim. King v. Acker is completely distinguishable from this case. In that situation, there was a written, signed prior will, which the probate court considered and determined that that was the valid instrument. Here, there's no evidence of a gift. There's no signed document. The only testimony in the record is that a catch-all trust was never prepared. The only evidence in the record is that the catch-all trust never existed. The reference to a term trust is simply that, a word trust appearing in a billing record that relates to work performed for Compagnie Victoire. There's no evidence that the word trust in that billing record had anything to do with a supposed catch-all trust or gift to Vicki. The evidence just isn't there. It had to do with the conduct of Vicki's business, though. Isn't that right? It had to do with a corporation that J. Howard actually created and actually gave to Vicki as he intended. The only evidence in the record is that the word trust in the billing record, related to a potential voting trust that was thought of to be had to protect Vicki and to control the corporation. There's no evidence that that word trust has anything to do with a catch-all trust. But apart from all of that, there is absolutely no evidence, no testimony, no document, no nothing, that Pierce ever saw a catch-all trust, ever suppressed a catch-all trust, ever tore up a catch-all trust, or did anything of the kind. I think that it's important also to point out that J. Howard did have income from the Living Trust. He drew a million-dollar salary. And that most of the money that he got to fund his gifts to Vicki was borrowed on MPI's line of credit. The Living Trust did not have any Koch stock in it. The Living Trust only had MPI stock in it. And there were exchanges back and forth out of the Living Trust for estate planning purposes, but the assets of MPI, the shares of MPI were exchanged for other valuable assets. At the time of J. Howard's death, there were assets worth many millions of dollars in the Living Trust. I'd also like to address the point about this claim of massive evidence of suppression. We've gone to great lengths in our briefs, I think, to demonstrate how that evidence simply is not there. We've also gone, I think, to lengths in our brief, and I raised it on opening argument, that there is no bankruptcy jurisdiction, period, unless the former debtor can demonstrate that the outcome of the litigation will have some effect on her estate. That's the In re Fights case, which we cite in our briefs. We wrote in our briefs that Vicki has not demonstrated that any creditor will receive one penny from the proceeds of this lawsuit, that the only evidence is that it will go solely to enrich her. Under In re Fights, there is no bankruptcy jurisdiction, period. If bankruptcy jurisdiction won't support this case, how about diversity jurisdiction? That was never alleged, Your Honor. I know it wasn't alleged. You know, you can test jurisdiction all the way to the U.S. Supreme Court if you want. I'm trying to test it here. Yes, Your Honor. And I'm asking the question, would diversity jurisdiction support this case? I believe it's a claim for more than $75,000. Correct, Your Honor. I believe, though, that at the time the litigation was commenced, that both parties were residents of Texas. Accordingly, there would not be diversity jurisdiction. I would suspect that Mrs. Marshall's residence was questionable. She had houses all over the place. Correct, Your Honor. There was a house in Texas. There was a house in Los Angeles. I think it's difficult to actually conclude one way or the other on the basis of this record. I wouldn't conclude anything. I mean, I wouldn't be as positive about it as you were that she was a resident of Texas. She came out to start her bankruptcy in California. She must have been a resident out here when she started that. And I believe that was contested in the proceedings below, but the issue was never finally resolved one way or the other. So on the basis of this record, Your Honor, I don't think I can answer your question completely one way or the other. I would also point out that at the beginning of the trial in the bankruptcy court, Vicki's counsel expressly abandoned on the record all of the other causes of action other than tortious interference. It's the only one she pursued. There are no other outstanding causes of action alleged that are possibly the subject of some sort of revision. I'd also like to point out that on the discharge appeal. Is that documented in the record? It is on the record, Your Honor. Okay. I'd also like to point out that the case that we rely on in the discharge appeal is the O'Loughlin case. The O'Loughlin case is one where this court held that where the elements of a cause of action or the elements of a claim arise after the discharge, it's not subject to the discharge. And we think the O'Loughlin case is clearly controlling on this precedent because all of the elements in the district court in fact expressly so found that all the elements of the claim for attorney's fees occurred long after Vicki's discharge in 1999. And the O'Loughlin case is properly the correct precedent. The cases which the cases. Do you place any stock in Siegel? I think, Your Honor, that Siegel and Kadjovich and Abercrombie are all distinguishable because they all had elements. You don't think Siegel helped your position? It may, Your Honor, but I think O'Loughlin is more directly on point because there you had a situation in which a claimant alleged discrimination before the county of Orange filed for bankruptcy and then facts alleging discrimination afterwards. And this court held that, well, you know, the fact that there was a relationship that straddled the discharge and the fact that there were some events in the history or there were some facts that were in before the discharge that occurred, there was a sufficient number of facts to support an independent claim after the discharge. Accordingly, the discharge did not bar it. And there's a very practical reason why that should apply here. It can't be the case that a debtor can get a discharge in bankruptcy and then do whatever it wants after the discharge, behave in any way that it wants to, inequitably or not, give rise to sanctions or not in a court proceeding, and then claim, oh, no, even though all the conduct and all the evidence of the claim and the cause of action accrued after my discharge, I'm shielded. That's pretty much what Judge Verdanda said on HCPs. It's some pretty big words to express it. Using the discharge as a sword. That would be this case, Your Honor, using the discharge as a sword rather than shield. That's what happened in Siegel. And I think, Your Honor, that I think, again, I think that the O'Loughlin case clearly stands for the precedent that that is not appropriate and can't be done in this case. If there are no further questions, Your Honor. Did you engage in any proceedings to collect your judgment for attorney's fees? No, Your Honor, I have not. There's no risk pending or seizures pending or property tied up or anything? No, there is not, Your Honor. Okay. Thank you, counsel. There was a stay. Thank you. Court is adjourned. All rise. This court's decision is now adjourned. Thank you.
judges: Beezer, Kleinfeld, Paez